IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PONDEROSA ADVISORS, LLC<br>D/B/A B3 INSIGHT,<br><br>*Plaintiff,*<br><br>v.<br><br>SOURCEWATER, INC. and<br>CASEE LEMON,<br><br>*Defendants.* | Civil Action No.: _____<br><br>Jury |

## PLAINTIFF'S VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Ponderosa Advisors, LLC, d/b/a B3 Insight ("B3") respectfully moves this Court for entry of a temporary restraining order, and thereafter a preliminary injunction, against Defendants Sourcewater and Casee Lemons, a Sourcewater employee. This Motion for Temporary Restraining Order and Preliminary Injunction is filed pursuant to Fed. R. Civ. P. 65 and 18 U.S.C. § 1836, expressly incorporates B3's Verified Complaint filed contemporaneously herewith, and in support B3 states:

### INTRODUCTION

This action arises out of Defendants' illegal and intentional theft of B3's proprietary database, in which B3 invested millions of dollars building. B3's database is its primary product and service offered to B3's customers, and Sourcewater is B3's only competitor in the water data market in Texas and New Mexico. Sourcewater's data regarding water used in the oil and gas industry is inferior to B3's data, and by misappropriating B3's proprietary databases, Sourcewater

1

could 'catch up' in the market with its data products and its other products that rely on this data, and thus unlawfully take customers from B3.

B3 gathers, analyzes, and organizes information about water, converting disparate, publicly available raw data into a tightly organized data architecture with industry-leading workflow tools and accessibility to users. Data-driven intelligence which enables smart water management is invaluable for multiple industries, including oil and gas, real estate, conservation, agriculture, and natural resource management. B3 combines its expertise in natural resources, resource economics, energy markets, agriculture, and the data economy with data management expertise in order to prepare data and insights in a useable format for its clients.

An audit of its databases revealed that B3's computer network recently was unlawfully accessed by a formerly authorized user. This user, Casee Lemons, previously worked for a Texas agency called the Bureau of Economic Geology ("BEG") as a Geologist. The BEG is a department within the University of Texas at Austin, and it is located in and works from Austin Texas.

As described below, B3 discovered the unauthorized access on July 30, 2021. Because the access came from multiple IP addresses, B3 conducted an extensive audit and investigation to rule out the unlikely scenario of innocent use from a current licensee. Innocent use was improbable based on the timing, location, and type of access made, but B3 wanted to make sure nonetheless. It was ruled out.

This Motion is being made *ex parte* because of the high probability that (1) evidence of unlawful access may be destroyed if not preserved by an Order of this Court, and (2) ongoing use of B3's data will enable Sourcewater to compete with B3 unlawfully by inequitably improving

Sourcewater's own water database products and other products that rely on its water database using B3's proprietary data and data architecture.

## FACTUAL BACKGROUND

B3's competitors have historically failed to provide comparably "structured" data for use within these industries. 'Structured' data, as that term is used here, is shorthand for B3 having analyzed millions of disparate data points, collected from a broad array of primary sources in varying states of quality, into an accurate and useable format that permits better business decisions to be made by B3 customers. In the example most pertinent here, B3 provides structured data to the oil and gas industry, collecting and processing disparate water data sources into its proprietary platform, OilfieldH2O, for use in visualizing, searching, and analyzing thousands of water use and disposal assets, seismic activity, and other data points that affect oilfield activity decision-making.

OilfieldH2O users can create customized maps with geospatial data, create customized, self-updating dashboards and visualizations enabling project outcome management, import geospatial data for integration into the B3 platform, and export data from the B3 platform for creating analytical reports based on accurate geographic information. These capabilitiescan, in turn, be used to plan projects with reliable and easily understood data regarding the lifecycle of water in the oil and gas industry.

B3 delivers its water data to customers via a number of channels. In one method, data feeds, customers purchase a license to the data and are given access to several methods to access B3's proprietary data at scale: through a website enabling manual download of full datasets in .csv format; through File Transfer Protocol (FTP); and "RESTful API" through which the customers can download B3's proprietary data and related information. By using an FTP or API with a

license, customers are able to obtain automated updates as new data and reports become available, with the data and reports transferred by operation of the API software rather than requiring a human to know about the availability of data and manually seek a download. By using a manual .csv download, customers are able to access entire proprietary datasets in bulk, which can be valuable to populate historical databases or when technical staff is unable to establish automated data downloads, but access to full datasets are required.

The value of the accurate and easily readable data insights B3 provides to its customers is inestimable. Water information guides decisions in the oil and gas industry that can inform water use for hydraulic fracturing, oil well drilling, strategic and business development, environmental and human safety risk, technical understanding of subsurface issues, evaluating seismic concerns, and regulatory matters. These questions are answered every day within the oil and gas industry using B3's data.

In 2018, BEG licensed B3's data related to Texas and New Mexico water from the OilfieldH2O platform to augment its own data collection, and to support its research. The BEG license initially included only the rights to access B3's web-based data application, OilfieldH2O Platform, including and the ability to manually download limited numbers of records from B3's database, each download initiated manually by downloading results in the OilfieldH2O Platform. After changing its license in 2020, BEG later had access to B3's data feeds, through which BEG was able to automate downloads of updated water information from B3 through .csv downloads and API. BEG has employed at least two geologists who were given access to B3 data, one of whom was Casee Lemons before she left BEG to join Sourcewater.

When she was an authorized user of the BEG license to B3 products, Ms. Lemons was assigned a specific user name and password, each of which was unique to her access to B3 data. Ms. Lemons had access to all of the licensed data and means of accessing that data that was paid for by the BEG license, and by virtue of the unique identifier she was able to download structured data from B3 for use in her hydrogeology research for the BEG. Ms. Lemons' user name at BEG was Casee.Lemons@beg.utexas.edu. BEG has confirmed with B3 that only two persons at BEG should presently have, or at relevant times should have had, access to B3 data, neither of whom is Casee Lemons.

Ms. Lemons left the BEG in April, 2019. On information and belief, Ms. Lemons went directly to Sourcewater, and began working for Sourcewater before October 26, 2019. Ms. Lemons remains employed with Sourcewater as of the date this Complaint is filed, and, according to Sourcewater's website, Ms. Lemons is currently the Director of Geoscience with Sourcewater.

Sourcewater is located at 801 Travis Street, Suite 1802, Houston, Texas 77002. The unauthorized access that B3 discovered was made via IP addresses, not coincidentally, in or near Houston Texas. BEG does not have employees working in Houston with access to B3 products, and per BEG, its authorized users of B3 products did not travel to Houston in 2021.

Defendant Sourcewater is the principle competitor to B3 for the sale of access to water data for use in in Texas and New Mexico. Sourcewater states on its website that its mission is "to build digital technologies that improve reliability and efficiency of the upstream energy supply chain while reducing environmental and community impacts." Its website further states that Sourcewater's founder "saw that the water supply chain would become the primary constraint on

and impact of the shale revolution and believed that the innovative application of new digital technologies could reduce the cost, risks, and impact of upstream energy growth."

In one case study posted on its website, a Sourcewater customer is quoted as stating that "[w]hen Sourcewater launched its produced water intelligence product and created the online platform it made [research on water source and rights data] so much easier. I can't even quantify how much time it saved me. it was a god send. I could do a week's worth of research in an afternoon." A partial list of the data Sourcewater sells which overlaps with the data B3 provides to customers includes groundwater data, Underground Injection Control (UIC) data, permits, basins and aquifers in Texas and New Mexico; geologic fault lines, active intervals of injection, and seismicity risk analysis in the Permian basin; and downloadable data related to groundwater basins, districts, aquifers, right of way and facility placement, and distance and area measurements.

On information and belief, however, Sourcewater has historically had difficulties with how its data was collected, organized and presented to customers or potential customers. In short, the data was not optimally 'structured,' and so the data that Sourcewater could provide to customers did not result in sufficiently accurate and useable decision-making tools. Particularly in comparison to B3, Sourcewater was not able to provide water users with the kind of data-driven intelligence that accurately and most effectively optimized their water use and disposal because of quality issues in its data.

On information and belief, Ms. Lemons was hired at Sourcewater to, *inter alia*, improve the data and data research Sourcewater could provide to customers. Ms. Lemons' LinkedIn profile indicates that she "specialize[s] in showing where oilfield water comes from and goes, both on the surface and under it." Further, Ms. Lemons helps "clients understand where they should move

their water for profitability, reliability and sustainability." Ms. Lemons plainly had use at Sourcewater for B3's structured data.

On information and belief, Sourcewater has been unlawfully obtaining B3 data since January of 2021 via Ms. Lemons' credentials. Ms. Lemons knew that her authorization to utilize her BEG credentials expired when she left BEG. And, at least because Ms. Lemons was and is a director at Sourcewater, Sourcewater knew or should have known that Ms. Lemons was using her unauthorized access to B3 data to augment, correct, and 'structure' the Sourcewater databases and products that it provided to clients for a fee.

On information and belief, Sourcewater has been selling, and continues to sell, data and analytical products to customers in the oil and gas business who purchase optimized data to reduce cost and improve accuracy related to water use and disposal. Improved quality of data is critical to Sourcewater's continued operations as a water data provider. Improvements in its data quality by theft of B3's data has made Sourcewater more competitive with B3, which has caused and/or will cause B3 to lose customers.

Sourcewater's theft of B3's data has also cost B3 the advantage it had in data quality. By using B3's data to shore up its own, less reliable data, Sourcewater has gained in its ability to compete with B3 without needing to invest in the time and resources that would have been required to organize and facilitate the use of its data internally. This advantage gained by Sourcewater came at no, or almost no cost to Sourcewater, and has resulted in a tremendous saving in data and technology investment. In contrast, B3 expended the time, tremendous expense, and many person-years of labor to create an industry leading water data set, which Sourcewater has, on information and belief, now exploited.

# AUTHORITY AND ARGUMENT

## I.    B3 IS ENTITLED TO A TRO AND THEN PRELIMINARY INJUNCTION

B3 requests a TRO and then a preliminary injunction pursuant to Fed. R. Civ. P. 65 based on any one of three causes of action from its Verified Complaint, filed contemporaneously with this Motion: (1) violation of the DTSA at 18 U.S.C. § 1831 against all defendants; (2) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and (3) Civil Theft in violation of Colorado Revised Statute 18-4-405. B3 also seeks these remedies pursuant to the federal Defend Trade Secrets Act ("DTSA").18 U.S.C. 1836(b)(3)(A).

A plaintiff seeking a temporary restraining order and preliminary injunction pursuant to Rule 65 must show: (1) a substantial likelihood that it will prevail on the merits, (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted, (3) its threatened injury outweighs the threatened harm to the party whom it seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017). In analyzing whether B3 has shown a probable right to recovery on its claims, it is important to keep in mind that B3 is not required to show that it is certain to win at trial; it must only present a prima facie case of its claims. *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011). B3 can more than meet this burden.

Because the likelihood of success and irreparable harm elements for a preliminary injunction and a TRO overlap substantially under Rule 65 and the DTSA, the bases for both are addressed in the context of an injunction, with the particular elements of a TRO addressed separately, below.

### A.    B3 Is Likely to Succeed on the Merits of Each Claim Addressed Herein

*1. Defendants misappropriated B3's trade secrets.*

B3's structured databases hold, *inter alia*, the water data from the Permian Basin along with the dictionaries for that data and the structure into which that data has been painstakingly analyzed and organized. This information has tremendous value, and is a secret. That information plainly was taken by Ms. Lemons as an officer of Sourcewater, without B3's permission.

    *a. The information Defendants took is a trade secret.*

The DTSA defines a trade secret, in relevant part, as all forms and types of business information, including data compilations. See 18 USC § 1839(3). The owner of the trade secrets must have taken reasonable measures under the circumstances to keep the information secret. See 18 USC § 1839(3). In addition, the information must "[derive] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use. *Id.*

B3's data is valuable because it is a data compilation organized by B3 into a bespoke data architecture which customers are willing to pay to access. The details of the databases are set forth above, but to reiterate, B3's structured databases relate to the operations, availability, ownership, and possibilities for use and disposal of water in the oil and gas industry cannot be obtained at this quality from any other source. The capability of oil and gas producers and water management companies to quickly ascertain this information is worth significant contracts. As evidence of the value, B3 further directs the Court to the fact that the Bureau of Economic Geology sources its water data from B3 through a paid license, rather than combing through the labyrinth of data points that are publicly available, digitizing them, and then organizing them for analysis. B3 has already

done the collection, digitization, analysis, integration, quality control, and organization, and the BEG licenses that data and data architecture rather than recreating that analysis.

Further, B3 does take steps to keep its data secret. First, it requires a user name and passcode that are unique to each user, not merely each license. For example, BEG has two current, authorized users of B3 data. Each of these users has their own unique credentials to access B3 data. Additionally, B3 conducts audits of its data use. In this instance, the July 30, 2021 audit discovered the Unauthorized Use complained of in the verified Complaint and in this Motion, above. B3 does not share its data, the organization or sources of its data, or the analysis invested into the databases that Defendants here downloaded without a paid license.

   *b. Defendants Misappropriated B3's Data*

B3's data was misappropriated by Casee Lemons and Sourcewater. Misappropriation means (A) acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by (1) a person who used improper means to acquire knowledge of the trade secret; at the time of disclosure or use knew or had reason to know that the person's knowledge of the trade secret was (a) derived from a person who used improper means to acquire the trade secret; or (2) acquired from a person who owed a duty to the person seeking relief to maintain the secrecy or limit use of the trade secret. *DTSA, at 18 USC 1839(C)*.

Here, Casee Lemons misappropriated B3's trade secrets by downloading the NewMexicoInjectionNotice version 1" 'TexasInjectionAndDisposal' v.2 databases, both of which are entire proprietary databases, as well as B3's data dictionary, which is a propriety guide to its data that is kept secure behind a login. Ms. Lemons knew from her employment at BEG that

access to these databases was granted by virtue of her employment at BEG, and that upon her departure from BEG her right to access B3's network and download its files was terminated.

Defendant Sourcewater misappropriated B3's trade secrets in two ways. First, Ms. Lemons is an officer of Sourcewater, and her misappropriation was an act of an officer of the company and therefore was an act of its agent. Second, it is evident from the July 7, 2021 access that at least two people within Sourcewater were involved in the unauthorized access. As set forth in detail above, Ms. Lemons' credentials from her time at BEG were used in Maumelle, Arkansas to access B3's data site without authorization, and navigate to B3's direct-download page. One hour and ten minutes later, Ms. Lemons' credentials were used in Magnolia, Texas to access the direct-download page and download the entire zip file containing all of B3's 'TexasInjectionAndDisposal' v.2 database. Ms. Lemons could not have travelled from Maumelle to Magnolia in seventy minutes, and Sourcewater's offices are in Magnolia. Ms. Lemons was not a rogue director, but was aided by another person at Sourcewater to take B3's secrets.

   2. *Defendants have violated the Computer Fraud and Abuse Act*

The elements necessary to show violation of the Computer Fraud and Abuse Act are straightforward. Title 18 U.S.C. §1030(g) provides that any person who suffers damage or loss by reason of any violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. As applied in this case, B3 must show that Defendants knowingly and with the intent to defraud, accesses a computer without authorization, and by means of such access furthers the fraud and obtains anything of value. *18 U.S.C. 1030(a)(3).*

B3's analysis of access to its network is unequivocal. Casee Lemons' user name and password were utilized to access B3's database after Ms. Lemons was no longer employed at the BEG. B3 tracked the IP addresses from which Ms. Lemons credentials accessed its network, and those credentials were used in Houston, Texas; Magnolia, Texas; and Maumelle, Arkansas. Sourcewater is located in Houston, as was Ms. Lemons at the time of the first access, and Ms. Lemons and her family are or were located in Maumelle. No B3 employee, officer or director has been to Maumelle, and no BEG employee accessed the databases from an IP address that traces back to Houston, Texas.

There is no legitimate reason for Defendants to access B3's database after Ms. Lemons left the BEG. Sourcewater is a direct competitor of B3 and, as referenced above, both Defendants know that exclusivity of control is one of the drivers behind the value of these databases. And again, not only is Sourcewater B3's primary competitor in the market for data related to water in Texas and New Mexico, but B3's use analysis shows that someone likely working with Sourcewater accessed and downloaded B3's data from Magnolia, TX while Ms. Lemons was in Arkansas.

This concerted use demonstrates that Sourcewater, and not merely Ms. Lemons, valued the information it took from B3 sufficiently to act in concert with Ms. Lemons to undertake in unauthorized access and misappropriation of B3 data on B3's computer network. The concerted access in particular further shows that Ms. Lemons and Sourcewater intended to, and did, defraud B3 by unlawfully accessing valuable computer files which Defendants knew they had no lawful right to access.

3. *Defendants have violated Colorado's civil theft act[1]*

Because B3 is a Colorado entity, with its officers and directors residing in Colorado, and the economic impact of the tort of civil theft being felt in Colorado, the Colorado Civil Theft statute applies. However, under either the Colorado or Texas civil theft statutes as addressed in footnote 1, B3 is likely to proceed on the merits of this claim. B3 has demonstrated that Defendants misappropriated its databases and that it owns the right to exclusivity of the databases it created. Defendants' took those databases, and deprived B3 of their value.

Sourcewater and Casee Lemons knew that they had no right to access B3's proprietary databases, and they knew that they were valuable to B3 both for their content and for B3's sole right of possession. The value of the databases lies both in their content and structure on the one hand, and in the fact of their exclusivity to B3 to the exclusion of a competitor like Sourcewater. Again, Casee Lemons knew her right of access was conditioned on her employment with BEG, and Sourcewater knew it was never granted access to B3's data, nor would it ever be granted access to B3's data.

Despite knowing these facts about B3's property, Defendants Lemon and Sourcewater have both accessed and, by downloading files, taken B3's property. Defendants' possession and control of B3's property was done with the specific intent to permanently deprive B3 of the

---

[1] Even if a choice of law analysis indicates that Texas law should apply to the theft in this case, and not Colorado law, the Texas Civil Theft Act at *Tex. Civ. Prac. & Rem. Code § 134* applies and was violated. In the event the data stolen was not a trade secret, both Colorado law and Texas law prohibit depriving another of their property, or withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner. Tex. Pen. Code § 31.01(2)(A). Whether applying Texas or Colorado civil theft statutes, B3 is likely to succeed on the merits.

exclusive use and benefit of its property, including the databases Defendants downloaded. On information and belief, Defendants are benefiting from their unlawful taking by virtue of the B3 databases' superior data quality, organization and usability. Further, Sourcewater may have incorporated B3's proprietary database and structures for either improving Sourcewater's Artificial Intelligence (AI) or machine learning products or data output from their AI or machine learning systems.

### B. Defendants' Misappropriation of B3's Trade Secrets, Violation of the computer Fraud Act, and Civil Theft will irreparably Harm B3 if a preliminary injunction is not granted.

The irreparable harm B3 will suffer is extensive and is common across all of the claims at issue in this Motion, and all stem directly from the facts that Defendants are now in possession of information that they can use, and may already be using, to injure B3. There simply is no reasonable argument that B3 will suffer no damages if Defendants are permitted to possess and use B3's trade secrets during the pendency of this litigation. B3's databases are uniquely valuable to its customers, and its customers pay for licenses to access the data which Defendants have misappropriated. BEG pays for a license to access B3's data, and the customer testimonials on Sourcewater's web page demonstrate that Defendants' own customer base finds organized, easily accessible water data to be a tremendous savings to their overall costs.

The question at this stage is whether Defendants' misappropriation will result in irreparable if an injunction is not granted. A party seeking injunctive relief must show the injury must be both irreparable and imminent. *See E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 276 (5th Cir. 2002); *see also Wright v. Sport Supply Grp., Inc.,* 137 S.W.3d 289, 293 (Tex. App.— Beaumont 2004, no pet.). The plaintiff must also show that it has no other adequate remedy at law.

*MeTX, LLC v. Wal-Mart Stores Texas, LLC*, No. 2:13CV547, 2014 WL 12570252, at *4 (E.D. Tex. June 6, 2014), report and recommendation adopted, No. 2:13CV547, 2014 WL 12599220 (E.D. Tex. July 9, 2014). The central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be compensated by money damages. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 810 n.1 (5th Cir. 1989).

A finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes establishment of the dollar value of the loss especially difficult or speculative. *Id.* (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 630 n. 12 (5th Cir. 1985). B3 meets both of these requirements here. Use of B3's injection and disposal data, analyzed and organized as it is, would allow Defendants to significantly improve the data and derivative products they provide to customers, enabling them to decrease B3's competitive advantage. Moreover, B3's reputation as having created the industry's leading database would be irreparably harmed if Defendants are permitted to use B3's own data to improve Sourcewater's data products and market itself as B3's equal. This damage to B3's reputation and competitive advantage are difficult to quantify in any case, let alone cases involving theft of software and digital data and related, proprietary information.

The entirety of damages also are difficult to ascertain because of the type of injuries at issue. *See Travelhost, Inc. v. Modglin*, No. 3:11-CV-0456-G, 2012 WL 2049321, at *5 (N.D. Tex. June 6, 2012) ("[D]ollar values cannot easily be assigned to a company's loss of clientele, goodwill, marketing techniques, or office stability."). B3's potential injury is irreparable if Sourcewater or Ms. Lemons are able to disclose B3's trade secret information to competitors, customers, or any other person. And Texas courts repeatedly recognize that plaintiffs in a trade

secret case often "cannot assign a dollar value" to its loss of clientele, reputation, and good will its customers. *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.— Houston [1st Dist.] 1982, no writ); *Frequent Flyer Depot, Inc.*, 281 S.W.3d at 228.

## C. The Irreparable Injury to B3 Outweighs the Potential Injury to Defendants

The preliminary injunction B3 seeks is narrowly tailored and would not cause Defendants any harm beyond the loss of use of one laptop, because the scope of the injunction seeks to stop the use of B3's data and the seizure of a computer. B3 does not seek to prevent Sourcewater from continuing to offer the products and services it developed and sells without the benefit of B3's databases. While Sourcewater may ultimately be liable for damages, therefore, B3 is not seeking an injunctive remedy which would cause Sourcewater to be unable to continue doing business with its lawfully acquired and created products and services. Further, B3 is not seeking any specific injunction against Ms. Lemons beyond turning over the computer that was used to download B3's databases. Ms. Lemons and Sourcewater can easily obtain another computer on which Ms. Lemons can conduct legitimate economic geological research and analysis. The harm to Defendants if the injunction is granted is minimal.

In contrast, as B3 loses customers or loses the competitive edge it maintains in the market for water data, that loss cannot be recovered. If the injunction is not granted, Sourcewater will be able to copy B3's data structures, learn from B3's analysis of the water data, and improve the AI and machine learning functions that it uses to analyze data it acquires legitimately and which it sells as a product. B3 has spent millions of dollars creating these databases; Sourcewater took them at no cost. The balance of harms plainly tilts toward, and only toward, granting the injunction.

Moreover, as the first theft took place in January, 2021, Sourcewater may already have, or will be able to, incorporate B3's databases into its product and service offerings in a way that cannot be unraveled at the end of a potentially lengthy litigation process without completely shutting down Sourcewater's network and dismantling Sourcewater's own databases. B3's interest as reflected in the proposed injunction is in protecting its business, not in foreclosing legitimate competition.

**D. Granting the Requested Preliminary Injunction Will Not Harm the Public Interests**

The injunction will not harm the public interest because the public has no interest in permitting Sourcewater to continue the use of B3's proprietary databases without B3's permission. Any public interest that exists here lies only in access to water data that supports the oil and gas industry, and the jobs and other economic benefit that accrues to the State of Texas in which those business and employees reside and work. B3 is not asking this Court to take any action that would deprive the public of the legitimately obtained water data from the Permian Basin or elsewhere which is provided by B3 *or* Sourcewater. The exploration, drilling, and extraction of oil and natural gas will not be disrupted, nor will the processing and sale of these products. In short, B3 does not seek to disrupt the provision of water data to the public other than by the analysis and distribution of B3 water databases to the public by Sourcewater. The public has no legitimate interest in the latter.

In fact, by way of a particularly relevant example, B3's proposed injunction is consistent with federal law and the Fifth Circuit which specifically recognize a specific public interest in precluding the use of a competitor's trade secrets or fraudulently obtained computer files. Violation of the Computer Fraud and Abuse Act is a criminal offense, punishable by not more than

ten years in prison when prosecuted as criminal. *See*, 18 U.S.C. 1030(c)(1). The public interest is furthered by the requested injunction, not harmed.

### E. The Court Should Only Require a Minimal Bond

This Court need not require B3 to post a sizeable bond. The purpose of a bond is to assure a defendant is not harmed by an injunction; and Defendants here will not be harmed. B3 does not seek to disrupt Sourcewater's legitimate business operations, nor does it seek to disrupt Ms. Lemons' legitimate geological research and analysis. Rather, B3 seeks to disrupt the unlawful use of its own databases to compete with it and Defendants have no interest in the misuse of B3's databases that could require redress.

B3 recognizes that it is seeking to deprive Ms. Lemons and Sourcewater of the use of a computer while it can be mirrored, and so they may be temporarily deprived of some value. As such, B3 proposes that bond be set at $1,000, which is more than adequate to compensate for the temporary lack of use of a laptop computer.

## II.    B3 IS ENTITLED TO A TEMPORARY RESTRAINING ORDER

In order to obtain a TRO pursuant to Fed. R. Civ. P. 65, B3 must show by affidavit or verified complaint that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required. *Fed. R. Civ. P.* 65. Beyond the Rule 65 requirements, a plaintiff seeking a temporary restraining order pursuant to the DTSA must (1) describe with particularity the matter to be seized; (2) identify the location of the material to be seized; (3) show that the person against whom the seizure order would be entered would move, destroy, hide, or otherwise make the matter to be seized inaccessible to the Court; and (4) B3 must verify that it has not made the application for the Seizure public. *Id.* All of these elements are satisfied by this verified motion.

B3 established the likelihood of immediate and irreparable injury, loss, or damage in Section II above, and incorporates those facts and arguments herein. The additional elements under Rule 65 and the DTSA are addressed below.

### A. Defendants Have Not Been Notified of this Motion, Nor Should Notice Be Required

Defendants are direct competitors of B3, and have surreptitiously accessed B3's data. B3's investigation indicates that at least one Sourcewater employee is aiding Ms. Lemons in accomplishing this misappropriation. Moreover, as a direct competitor to B3, Sourcewater is undoubtably aware of both the value of B3's data to Sourcewater and the potential liability for its misappropriation.

Sourcewater itself claims that its products are "exclusive," it plainly knows that the water data has value, and it is actively communicating about improvements and developments in water data in the Permian Basin – the same data that Ms. Lemons' credentials were used to access. for example, on August 16, 2021 Sourcewater published on its website a video indicating that that it is "developing tools to track, in near real-time, proppants, water and crude." On August 10, 2021 Sourcewater published an article on its website commenting on public notice of intent filings for salt water disposal or injection wells in the Permian Basin, with a comment that the data was revised August 11, 2021. This latter article and revision were four weeks after B3's entire Texas Injection data zip drive was downloaded containing B3's entire database for the Texas portion of the Permian Basin.

Defendants may have already used B3's data, and will have no need to retain the data that would show their misappropriation. The risk that Defendants will destroy the laptop and any related evidence is substantial.

### B. Identification of the Material to be Seized

B3 does not have access to the specific model number of the laptop to be seized. B3 is aware, however, that the computer is likely a laptop because Ms. Lemons' unique credentials have been used in multiple locations as shown by various IP addresses. Moreover, Ms. Lemons was able to access B3's network in Arkansas even though her employment is based near Houston, Texas. This demonstrates a portability that requires a laptop; and the access in July from Arkansas where Ms. Lemons' family lives shows that it was Ms. Lemons' computer and not another Sourcewater employee. While B3's investigation shows that there is at least one other person

involved, and thus at least one other computer, Ms. Lemons' computer is the only material that can be identified with specificity pursuant to 18 USC 1836(b)(2)(A)(VI).

### C. Location of the material to be Seized

Ms. Lemons' publicly available Facebook page indicates that, when the page was last accessed on August 5, 2021, Ms. Lemons was in Maumelle, Arkansas at either her home or her family's home. Ms. Lemons' employer, however, is located at 801 Travis Street, Houston, Texas 77002. On information and belief, Ms. Lemons' laptop can be seized by virtue of service of the order for the laptop to be seized at Sourcewater's place of business.

### D. Defendants Are Likely to Move, Destroy, Hide or otherwise Prevent Access to and Inspection of the Laptop to Be Seized.

As set forth in Section A of this TRO argument, above, Defendants are direct competitors of B3, and have surreptitiously accessed B3's data. B3's investigation indicates that at least one Sourcewater employee is aiding Ms. Lemons in accomplishing this misappropriation. Moreover, as a direct competitor to B3, Sourcewater is undoubtably aware of both the value of B3's data to Sourcewater and the potential liability for its misappropriation.

Sourcewater itself claims that its products are "exclusive," it plainly knows that the water data has value, and it is actively communicating about improvements and developments in water data in the Permian Basin – the same data that Ms. Lemons' credentials were used to access. for example, on August 16, 2021 Sourcewater published on its website a video indicating that that it is "developing tools to track, in near real-time, proppants, water and crude." On August 10, 2021 Sourcewater published an article on its website commenting on public notice of intent filings for salt water disposal or injection wells in the Permian Basin, with a comment that the data was revised August 11, 2021. This latter article and revision were four weeks after B3's entire Texas

4836-2570-4952.1

Injection data zip drive was downloaded containing B3's entire database for the Texas portion of the Permian Basin.

Defendants may have already used B3's data, and will have no need to retain the data that would show their misappropriation. The risk that Defendants will destroy the laptop and any related evidence is substantial.

**E. This Motion for a Temporary Restraining Order has not Been Made Public, Nor Otherwise Publicized.**

Although B3 has investigated the use of the credentials, it has not notified any party outside of B3 or its counsel of the claimed misappropriation, nor of the temporary restraining order requested herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks an Order from this Court as follows:

(a)    Defendants Casee Lemons and Sourcewater must preserve the laptop computer that Ms. Lemons used between January 20, 2021 and July 31, 2021;

(b)    That Defendants Casee Lemons and Sourcewater preserve any and all communications, downloads, files, or other electronic materials in any way related to or containing B3 or B3 data;

(c)    That Defendants Lemons and Sourcewater surrender the laptop computer that Ms. Lemons used between January 20, 2021 and July 31, 2021 to the Court for preservation and copying by a B3 representative for the purpose of forensic analysis; and

(d)     That Defendants immediately cease and desist all use of, access to, or transmission of any and all data, files, programs, API, or other electronic material in its possession which was downloaded or otherwise acquired from B3 without B3's express permission.

Dated this ____ day of August, 2021.

Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

By:     */s/ Donald E. Lake, III*
Donald E. Lake, III, Esq.
1700 Lincoln Street, Suite 4000
Denver, Colorado 80203
Phone: (303) 861-7760
Tripp.Lake@lewisbrisbois.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Kelly Bennett, having read the Verified Motion for Temporary Restraining Order, certify that the information contained herein is true and correct and to the best of my knowledge, information, and belief.

_____

Kelly Bennett, CEO
B3 Insight

Subscribed and sworn to before me this 26th day of August, 2021, by Kelly Bennett.

Witness my hand and official seal.

My commission expires: 07·19·2022

> KRISTEN L. WINDLER
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20184029311
> MY COMMISSION EXPIRES 07-19-2022

Notary Public